UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| MINERVA USA, LLC,<br>    *Plaintiff*,<br><br>    v.<br><br>DANIEL M. MCCABE and DANIEL M.<br>MCCABE, LLC,<br>    *Defendants*. | No. 3:19-cv-1476 (VAB) |

**RULING AND ORDER ON MOTION TO DISMISS**

Minerva USA, LLC ("Minerva" or "Plaintiff") has sued Daniel M. McCabe, Esq. ("Mr. McCabe") and Daniel M. McCabe, LLC ("McCabe") (collectively "Defendants") for negligence, negligent misrepresentation, breach of fiduciary duty, breach of the implied covenant of good faith and fair dealing, and violation of the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 41-110b(a) ("CUTPA").

Defendants have moved to dismiss Count Five of the Complaint for violation of CUTPA, each corresponding prayer for relief, and the prayer for relief demanding a constructive trust on November 25, 2019.

For the following reasons, the motion to dismiss is **GRANTED.**

Count Five of the Complaint, any corresponding prayer for relief, and the prayer for relief demanding a constructive trust are dismissed from this lawsuit. Minerva, however, may move by **August 28, 2020** to amend the Complaint and replead the dismissed claim and any relief also dismissed, if there is a factual and legal basis to do so.

1

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. Factual Allegations

Minerva is a single-member limited liability company run by Huili Ma, a woman from China whose first language is Mandarin Chinese. Compl., ECF No. 1 ¶ 10 (Sept. 19, 2019). Ms. Ma allegedly lives in Flushing, New York. *Id.* ¶ 7.

In late September 2016, Minerva allegedly sought the services of Mr. McCabe to assist with some real estate purchases. *Id.* ¶¶ 11–12. Mr. McCabe is allegedly the sole member of Daniel M. McCabe, LLC, a limited liability company in Stamford, Connecticut. *Id.* ¶ 9. Minerva and McCabe allegedly entered into an attorney-client relationship where McCabe would render all legal services in connection with Minerva's purchase of Units 206, 306, 313, 314, 403, and 407 at 22 Glenbrook Road, Stamford, Connecticut 06902 (the "Units"). *Id.* ¶¶ 13, 15. As part of the legal services offered, McCabe allegedly represented to Minerva that he would "conduct due diligence on the Units and the related condominium association . . . analyze, assess, and opine on the financial condition of the Units' condominium association; engage competent vendors to inspect and appraise the Units, along with the structures, improvements and the common areas of the Units' condominium association; and negotiate material terms and conditions, including the purchase price, of Minerva's purchase of the Units." *Id.*

Minerva alleges that McCabe simultaneously represented Paul Ventura, and allowed him to purchase the Units at a certain price, and then allowed him to resell or "flip" the Units to Minerva at a higher price within a very short period of time, sometimes within the same day. *Id.* ¶ 2. Minerva further alleges that McCabe allowed Mr. Ventura to use money that Minerva had deposited in escrow to purchase the Units before selling them to Minerva at a higher price. *Id.* ¶ 3. Minerva alleges that McCabe did not disclose that he was simultaneously acting as Ventura's

attorney. *Id.* In other words, Minerva alleges that McCabe "actively participated in this scheme without disclosing that [he was] acting as the attorney[] for both sides of the transaction, in which the Plaintiff's money was being used to fund the flipping scheme." *Id.* ¶ 3. In addition, Minerva alleges that McCabe did not disclose the price that Mr. Ventura paid for the Units. *Id.* ¶ 4.

Minerva claims that the "Defendants . . . represented that they had over 40 years of experience representing thousands of buyers and sellers of real estate, including condominiums, and that they had superior knowledge, skill or expertise in the field of real estate matters, and that [] McCabe was a religious devotee." *Id.* ¶ 12. Minerva also claims that she reviewed McCabe's website, which allegedly stated that Daniel M. McCabe, LLC had extensive experience in real estate matters, handled all phases of real estate matters, and gave personal attention to each client. *Id.* ¶ 12. Minerva alleges that she relied on McCabe's representations when making the decision to purchase the Units. *Id.* ¶ 13. Had she known about the flipping scheme, Minerva claims she would not have agreed to pay more than what Mr. Ventura originally paid for the Units. *Id.* ¶ 4.

### 1.  Purchases of Unit 403

On September 22, 2016, McCabe allegedly represented Mr. Ventura in connection with the purchase of Unit 403 from Haiyu Huang for $80,000. *Id.* ¶ 15.

On September 26, 2016, McCabe allegedly represented Minerva in connection with the purchase of Unit 403 from Mr. Ventura for $110,000, which was $30,000 more than Ventura paid for the Unit. *Id.* ¶ 16.  Mr. McCabe allegedly knew that Mr. Ventura had paid a lower price for Unit 403, and allegedly failed to disclose that information to Minerva. *Id.* ¶ 15.

### 2. Minerva's Escrow Funds for Units 206, 306, and 407

On October 17, 2016, Minerva allegedly sent by wire approximately $36,000 to McCabe to hold in trust for the purchase of Units 206, 306, and 407, and then sent a second wire on October 28, 2016 for $329,297.36 for purchase of those same Units (the "Funds"). *Id.* ¶ 17. McCabe allegedly accepted these Funds and held them in escrow for Minerva. *Id.*

### 3. Purchases of Unit 407

On October 17, 2016, McCabe allegedly represented Mr. Ventura in connection with the purchase of Unit 407 from Judy Zhu Huang for $95,000. *Id.* ¶ 18. McCabe allegedly released a portion of the Funds to Ventura for use in purchasing Unit 407, without ever informing Minerva that the Funds were being used for this purpose. *Id.* ¶ 19.

On October 27, 2016, McCabe allegedly represented Minerva in connection with the purchase of Unit 407 from Ventura for $120,000, which was $25,000 more than Mr. Ventura had paid a few days earlier. *Id.* ¶ 20. Mr. McCabe allegedly knew that Mr. Ventura had paid a lower price for Unit 407, and allegedly failed to disclose that information to Minerva. *Id.*

### 4. Purchases of Unit 206

On November 14, 2016, McCabe allegedly represented Mr. Ventura in connection with the purchase of Unit 206 from Katrina K. Camera, Esq., Conservator of the Estate of Ann Lampman, for $95,000. *Id.* ¶ 21. McCabe allegedly released a portion of the Funds to Mr. Ventura for use in purchasing Unit 206, without ever informing Minerva that the Funds were being used for this purpose. *Id.* ¶ 22.

On November 17, 2016, McCabe allegedly represented Minerva in connection with the purchase of Unit 206 from Mr. Ventura for $120,000, an amount $25,000 more than what Mr. Ventura had paid for the same Unit a few days earlier. *Id.* ¶ 23. Mr. McCabe allegedly knew that

Mr. Ventura had paid a lower price for Unit 206, and allegedly failed to disclose that information to Minerva. *Id.* ¶¶ 21, 23.

### 5. Purchases of Unit 306

On November 17, 2016, McCabe allegedly represented Mr. Ventura in connection with the purchase of Unit 306 from Maren T. Dipasquale and Roger F. Norum for $90,000. *Id.* ¶ 24. McCabe allegedly released a portion of the Funds to Mr. Ventura so that he could use those Funds for the purchase of Unit 306, without ever informing Minerva that the Funds were being used for this purpose. *Id.* ¶ 25.

That same day, McCabe allegedly represented Minerva in connection with the purchase of Unit 306 from Mr. Ventura for $120,000, an amount $30,000 more than what Mr. Ventura paid for the Unit. *Id.* ¶ 26. Mr. McCabe allegedly knew that Mr. Ventura had paid a lower price for Unit 306, and allegedly failed to disclose that information to Minerva. *Id.* ¶¶ 24, 26.

### 6. Purchases of Unit 313

On December 6, 2016, McCabe allegedly represented Mr. Ventura in connection with the purchase of Unit 313 from Yuri Shenderov and Svetlana Polyak for $131,000. *Id.* ¶ 27. McCabe allegedly released a portion of the Funds to Mr. Ventura so that he could use those Funds for the purchase of Unit 313, without ever informing Minerva that the Funds were being used for this purpose. *Id.* ¶ 28.

On December 7, 2106, McCabe allegedly represented Mr. Ventura in connection with the purchase of Unit 313 from Ventura for $140,000, an amount $9,000 more than what Mr. Ventura paid for the Unit. *Id.* ¶ 29. Mr. McCabe allegedly knew that Mr. Ventura had paid a lower price for Unit 306, and allegedly failed to disclose that information to Minerva. *Id.* ¶¶ 27, 29.

### 7. Purchases of Unit 314

On February 3, 2017, Minerva allegedly sent by wire approximately $140,000 to McCabe for him to hold in escrow for the purchase of Unit 314. *Id.* ¶ 30.

On February 28, 2017, McCabe allegedly represented Mr. Ventura in connection with the purchase of Unit 314 from Vidya, LLC for $120,000. *Id.* ¶ 31. McCabe allegedly released a portion of the Funds to Mr. Ventura so that he could use those Funds for the purchase of Unit 314, without ever informing Minerva that the Funds were being used for this purpose. *Id.* ¶ 32.

On March 1, 2017, McCabe allegedly represented Minerva in connection with the purchase of Unit 314 from Mr. Ventura for $140,000, an amount $20,000 more than Ventura paid for the Unit. *Id.* ¶ 33. Mr. McCabe allegedly knew that Mr. Ventura had paid a lower price for Unit 306, and allegedly failed to disclose that information to Minerva. *Id.* ¶¶ 31, 33.

Minerva alleges that, for each of these transactions, Defendants were aware of and knowingly facilitated Mr. Ventura's flipping scheme while intentionally concealing Mr. Ventura's actions and their involvement with Mr. Ventura from Minerva. *Id.* ¶ 34. Minerva alleges that the flipping scheme became evident when the title for each Unit was recorded and became a public record. *Id.* ¶ 34. Attached to the Complaint are copies of the warranty deeds conveying title to Mr. Ventura for the purchase of each Unit. *Id.* Minerva alleges that Defendants received a copy of these records showing Mr. Ventura's lower purchase price and Minerva's higher purchase price. *Id.*

### B. Procedural History

On September 19, 2019, Minerva filed the Complaint against Defendants, alleging negligence, negligent representation, breach of fiduciary duty, breach of the implied covenant of good faith and fair dealing, and violation of CUTPA. Compl., ECF No. 1 (Sep. 19, 2019).

6

On November 25, 2019, Defendants moved to dismiss Count Five of the Complaint alleging a violation of CUTPA, each corresponding prayer for relief, and the prayer for relief demanding a constructive trust. Defs.' Mot. to Dismiss, ECF No. 12 (Nov. 25, 2019); Defs.' Mem. in Support of Mot. to Dismiss, ECF No. 12 at 4–14 (Nov 25, 2019) ("Defs.' Mem.").

On January 6, 2020, Minerva filed her opposition. Mem. of Law in Opp'n to Mot. to Dismiss, ECF No. 25 (Jan. 6, 2020) ("Pl.'s Opp'n").

On January 21, 2020, Defendants filed their reply brief. Defs.' Reply to Pl.'s Opp'n, ECF No. 26 (Jan. 21, 2020) ("Defs.' Reply").

## II.   STANDARD OF REVIEW

A complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a). Any claim that fails "to state a claim upon which relief can be granted" will be dismissed. Fed. R. Civ. P. 12(b)(6). In reviewing a complaint under Rule 12(b)(6), a court applies a "plausibility standard" guided by "two working principles." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

First, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*; *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) ("While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations . . . a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." (internal citations omitted)). Second, "only a complaint that states a plausible claim for relief survives a motion to dismiss." *Iqbal*, 556 U.S. at 679. Thus, the complaint must contain "factual amplification . . . to render a claim plausible."

*Arista Records LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) (quoting *Turkmen v. Ashcroft*, 589 F.3d 542, 546 (2d Cir. 2009)).

When reviewing a complaint under Federal Rule of Civil Procedure 12(b)(6), the court takes all factual allegations in the complaint as true. *Iqbal*, 556 U.S. at 678. The court also views the allegations in the light most favorable to the plaintiff and draws all inferences in the plaintiff's favor. *Cohen v. S.A.C. Trading Corp.*, 711 F.3d 353, 359 (2d Cir. 2013); *see also York v. Ass'n of the Bar of the City of N.Y.*, 286 F.3d 122, 125 (2d Cir. 2002) ("On a motion to dismiss for failure to state a claim, we construe the complaint in the light most favorable to the plaintiff, accepting the complaint's allegations as true.")).

A court considering a motion to dismiss under Rule 12(b)(6) generally limits its review "to the facts as asserted within the four corners of the complaint, the documents attached to the complaint as exhibits, and any documents incorporated in the complaint by reference." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007). A court may also consider "matters of which judicial notice may be taken" and "documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit." *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993); *Patrowicz v. Transamerica HomeFirst, Inc.*, 359 F. Supp. 2d 140, 144 (D. Conn. 2005).

### III. DISCUSSION

#### A. The CUTPA Claim

CUTPA provides that "[n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Conn. Gen. Stat. § 42-110b(a). Trade or commerce "is broadly defined as 'the advertising, the sale or rent or lease, the offering for sale or rent or lease, or the distribution of any services and any property,

tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value in this state.'" *Fink v. Golenbock*, 239 Conn. 183, 212–13 (1996); *see also* Conn. Gen. Stat. § 42-110a(4). CUTPA further provides that "[a]ny person who suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment of a method, act or practice prohibited by section 42-110b, may bring an action to recover actual damages," punitive damages, and equitable relief. Conn. Gen. Stat. § 42-110g(a).

"CUTPA is to be construed in accord with interpretations by the Federal Trade Commission and by the federal courts of the Federal Trade Commission Act." *Fabri v. United Techs. Int'l, Inc.*, 387 F.3d 109, 119–20 (2d Cir. 2004); Conn. Gen. Stat. § 42–110b(b). "Thus, Connecticut has adopted the Commission's 'cigarette rule' to determine whether a practice is unfair under CUTPA." *Fabri*, 387 F.3d at 119–20. When determining whether a practice violates CUTPA, Connecticut courts weigh the following factors:

> (1) whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise—whether, in words, it is within at least the penumbra of some common-law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers (or competitors or other businessmen).

*Fabri*, 387 F.3d at 120.

"A CUTPA plaintiff need not establish all three criteria to demonstrate unfairness." *Fabri*, 387 F.3d at 120; *see also Cheshire Mortg. Serv., Inc. v. Montes*, 223 Conn. 80, 112–14 (1992) (holding that plaintiff mortgage servicer's violation of Truth in Lending Act and Conn. Gen. Stat. § 36-224 amounted to violation of CUTPA because although violations were not immoral, unethical, oppressive, or unscrupulous, they "offend[ed] public policy so as to amount

9

to an established concept of unfairness" and together constituted substantial injury). "Instead, a practice may be shown to be unfair either 'because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three.'" *Fabri*, 387 F.3d at 120 (quoting *Cheshire*, 223 Conn. at 106). "The practice attacked may be actually deceptive 'or a practice amounting to a violation of a public policy.'" *Id.* (quoting *Cheshire*, 223 Conn. at 106). "The plaintiff need not show intent to deceive." *Id.*

In order to prevail on a CUTPA claim, a plaintiff must first prove "that [she] has suffered an ascertainable loss due to a CUTPA violation" before she may seek relief. *Di Teresi v. Stamford Health Sys., Inc.*, 149 Conn. App. 502, 509 (2014) (quoting *Artie's Auto Body, Inc. v. Hartford Fire Ins. Co.*, 287 Conn. 208, 217–18 (2008)). An ascertainable loss is "capable of being discovered, observed or established[,]" but only requires the loss to be measurable; it does not need to be a precise dollar amount. *Id.* (citation omitted). A plaintiff must also "establish both that the defendant has engaged in a prohibited act and that, 'as a result of' this act, the plaintiff suffered an injury." *Abrahams v. Young and Rubicam, Inc.*, 240 Conn. 300, 306 (1997) (emphasis omitted). "The language 'as a result of' requires a showing that the prohibited act was the proximate cause of a harm to the plaintiff;" *id.*, "mere 'but for' causation is not sufficient to support a CUTPA claim," *id.* at 308.

Although not explicitly stated, Minerva alleges in Count Five of its Complaint, by incorporating the prior counts, that the following actions by the Defendants amount to a violation of CUTPA: representing Mr. Ventura while simultaneously representing Minerva without disclosing the attorney-client relationship with Mr. Ventura; fraudulently concealing the price

10

Ventura paid for the Units; and fraudulently releasing Minerva's escrow funds to Ventura for the purpose of purchasing the Units without informing her or obtaining her consent.[1]

Defendants argue that Minerva fails to state an actionable CUTPA claim because Minerva's allegations—that the Defendants concealed Mr. Ventura's fraudulent scheme, the price he paid for the Units, and the conflict of interest—do not relate to the entrepreneurial aspects of the practice of law. Defs.' Mem. at 8–9.

In Defendants' view, a successful CUTPA claim involving the provision of legal services must allege conduct related to "how the price of legal services is determined, billed and collected and the way a firm obtains, retains and dismisses clients," which Minerva has failed to do. *Id.* at 10 (citation omitted). Defendants argue that Minerva's CUTPA claim is solely grounded on a theory of negligence and amounts to a legal malpractice claim and "nothing more." *Id.* Furthermore, even assuming *arguendo* that Minerva could bring a CUTPA claim premised on Defendants' negligence, Defendants contend that Count Five lacks any allegation involving Defendants' "immoral, unethical, oppressive or unscrupulous" conduct. *Id.*

In response, Minerva argues that Defendants took advantage of Minerva to assist Mr. Ventura in carrying out his "fraudulent scheme" and in doing so were "acting as [Mr.] Ventura's agent," which amounted to entrepreneurial activity. Pl.'s Opp'n at 14–15. In other words, because Mr. Ventura would "certainly be liable" as the seller of the real estate for engaging in allegedly fraudulent activity, "his agent law firm should also be liable." *Id.* at 13. Minerva submits that "at the moment these wrongful acts took place, the Defendants were representing [Mr.] Ventura in trying to take advantage of the Plaintiff." *Id.* According to Minerva, "[a]ssisting

---

[1] Count Five of the Complaint consists solely of the incorporation of the prior four counts for negligence, negligent misrepresentation, breach of fiduciary duty, and breach of the implied covenant of good faith and fair dealing without any allegations unique to the CUTPA claim itself. Compl. ¶¶ 68–70.

11

one client to take advantage of another for profit is [] . . . [e]ntrepreneurial . . . and . . . not the exercise of skill, strategy, or judgement [sic] for the Plaintiff." *Id.* at 14.

In reply, Defendants argue that Minerva's "purported argument – raised for the first time [here] – that Defendants are liable under CUTPA because they were 'acting as the agent of the Seller of the real estate who would certainly be subject to CUTPA' must fail because it is not pled in the Complaint." Defs.' Reply at 2. Consequently, Defendants assert that the Court cannot consider these facts with respect to the instant motion to dismiss. *Id.* Furthermore, Defendants argue that without any allegation that Defendants' conduct involved the entrepreneurial aspects of the practice of law—*i.e.*, "the price of the Defendants' service, how they were billed, or the way in which the Defendants solicited the Plaintiff"—Minerva's CUTPA claim is insufficient as a matter of law. *Id.* at 3 (emphasis omitted).

The Court agrees.

The Connecticut Supreme Court has stated that, "in general, 'CUTPA applies to the conduct of attorneys.'" *Beverly Hills Concepts, Inc. v. Schatz & Schatz, Ribicoff & Kotkin*, 247 Conn. 48, 79 (1998) (quoting *Heslin v. Conn. Law Clinic of Trantolo & Trantolo*, 190 Conn. 510, 521 (1983)). "The statute's regulation of the conduct of any trade or commerce does not totally exclude all conduct of the profession of law," but includes "only the entrepreneurial aspects of the practice of law are covered by CUTPA." *Id.* (internal quotation marks and citation omitted). As a result, legal malpractice does not fall under CUTPA. *Id.*; *see also Haynes v. Yale–New Haven Hosp.*, 243 Conn. 17, 32–34 (1997) (reasoning that practice of law and medicine may give rise to CUTPA claims only for entrepreneurial aspects, such as solicitation and billing, and not for claims involving issues of competence and strategy). Thus, "the central question for the court in considering" CUTPA claims is whether the underlying conduct "'is part of the

attorney's professional representation of a client or is part of the entrepreneurial aspect of practicing law." *Tatum v. Oberg*, 650 F. Supp. 2d 185, 194 (D. Conn. 2009) (quoting *Suffield Development Assocs. Ltd. P'ship v. Nat'l Loan Inv'rs, L.P., et al.*, 260 Conn. 766, 782 (2002)).

Here, Minerva does not allege conduct by the Defendants relating to advertising, billing, or any other function relating to the entrepreneurial aspects of the practice of law. *See, e.g.*, *Tatum v. Oberg*, 650 F. Supp. 2d 185, 194–95 (D. Conn. 2009) (denying motion to dismiss allegations that defendant lawyer billed plaintiff for legal services that were never performed, but granting motion to dismiss allegations that lawyer encouraged plaintiff to enter settlement agreement to increase legal fees, made false statements over course of representation, and failed to provide timely and correct legal advice because those allegations related to lawyer's representation of plaintiff and thus were not part of the entrepreneurial aspects of practice of law). And "the mere fact that the actions of the attorney and the law firm might have deviated from the standards of their profession does not necessarily make the actions entrepreneurial in nature." *Suffield*, 260 Conn. at 782.

Furthermore, although Minerva argues that McCabe's assistance of one client, Mr. Ventura, to "take advantage of another for profit" amounts to a CUTPA violation, *see* Pl.'s Opp'n at 14, "[m]any decisions made by attorneys eventually involve personal profit as a factor, but are not considered part of the entrepreneurial aspect of practicing law," *Suffield*, 260 Conn. at 782. *See also Kalra v. Adler Pollock & Sheehan P.C.*, No. 3:18-cv-260 (KAD), 2019 WL 319397, at *5 (D. Conn. Jan. 24, 2019) ("An allegation . . . that the attorney's conduct[] was motivated by personal greed does not bring the conduct at issue within the parameters of CUTPA."). Finally, to the extent that Minerva alleges intentional misconduct, CUTPA remains inapplicable to McCabe. *See Suffield*, 260 Conn. at 784 ("protecting professional conduct from

13

CUTPA liability ensures that no attorney is discouraged from intentional and aggressive actions, believed to be in the interest of a client . . . ."); *see also Kalra*, 2019 WL 319397, at *6 ("Finally, allegations of intentional misconduct, to the extent such claims are included here in the performance of an attorney's responsibilities, are also exempted from CUTPA's reach." (citing *Suffield*, 260 Conn. at 784)). In short, because Minerva's allegations of Defendants' improper conduct all relate to their professional representation of Minerva, these allegations are insufficient to state a claim under CUTPA. *See Iqbal*, 556 U.S. at 679 ("only a complaint that states a plausible claim for relief survives a motion to dismiss"); *Twombly*, 550 U.S. at 555 ("While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations . . . a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." (internal citations omitted)).

Accordingly, the CUTPA claim, along with its corresponding prayer for relief, will be dismissed.

### B. The Request for a Constructive Trust

Under Connecticut law, "[t]he imposition of a constructive trust by equity is a remedial device designed to prevent unjust enrichment." *Town of New Hartford v. Conn. Res. Recovery Auth.*, 291 Conn. 433, 466 (2009). "When property has been acquired in such circumstances that the holder of the legal title may not in good conscience retain the beneficial interest, equity converts him into a trustee." *Id.* "[A] constructive trust arises where a person who holds title to property is subject to an equitable duty to convey it to another on the ground that he would be unjustly enriched if he were permitted to retain it." *Id.* "A claimant seeking a constructive trust 'must identify property in the hands of the [defendant] that represents or embodies . . . property

14

obtained at the claimant's expense or in violation of the claimant's rights.'" *Id.*; *see also Counihan v. Allstate Ins. Co.*, 194 F.3d 357, 361 (2d Cir. 1999) (applying New York law and holding that court must identify a party who is holding property under such circumstances that principles of equity and good conscience demand that the party cannot retain title to it).

"Because a constructive trust is an equitable remedy, its application is only appropriate when there is no available adequate legal remedy." *United States v. $2,350,000.00 In Lieu of One Parcel of Prop. Located at 895 Lake Ave. Greenwich, Conn.*, 718 F. Supp. 2d 215, 229 (D. Conn. 2010) (citing *Wendell Corp. Tr. v. Thurston*, 239 Conn. 109, 120–121 (1996)).

Defendants argue that Minerva's prayer for a constructive trust must be dismissed because it does not allege any claim for unjust enrichment and the allegations in the Complaint do not support such a claim. Def.'s Mem. at 12–13.[2]

The Court agrees.

Minerva alleges that it "has suffered damages in excess of $800,000" as a result of Defendant's conduct, but does not identify any property that could be subject to imposition of a constructive trust, other than the Units. *See Town of New Hartford*, 291 Conn. at 466 ("A claimant seeking a constructive trust 'must identify property in the hands of the [defendant] that represents or embodies . . . property obtained at the claimant's expense or in violation of the claimant's rights.'"). Indeed, Minerva holds title to the Units it purchased from Mr. Ventura. *See* Compl. ¶ 1 ("[Minerva] brings claims with respect to [its] purchase of six condominium units . . . ."); *see also id.* ¶ 35 (summary of purchases with dates for when Minerva's deed was recorded for each Unit). Minerva thus has not alleged a claim of unjust enrichment or identified any property in its Complaint subject to a constructive trust.

---

[2] Minerva did not brief its request for constructive trust in its opposition to the motion to dismiss.

15

Accordingly, the prayer for relief requesting a constructive trust will be dismissed.

### C. Leave to Amend

Although the Court will dismiss Count Five, any related relief, and the prayer for relief demanding a constructive trust, Minerva may move by **August 28, 2020** to amend the Complaint and replead the dismissed claim and any relief also dismissed, if there is a factual and legal basis to do so. *See* Fed. R. Civ. P. 15(a) (the "court should freely give leave [to amend] when justice so requires"); *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007) ("A district court has discretion to deny leave for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party,"); *Lucente v. Int'l Bus. Machs. Corp.*, 310 F.3d 243, 258 (2d Cir. 2002) (noting leave to amend may be denied when amendment is "unlikely to be productive," such as when an amendment is "futile" and "could not withstand a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6)." (internal citation omitted)); *see also Artskills, Inc. v. Royal Consumer Prod., LLC*, No. 3:17-cv-1552 (VAB), 2018 WL 6304348, at *5–6 (D. Conn. Dec. 3, 2018) (granting defendant leave to amend counterclaim because proposed counterclaim cured deficiency of false marketing claim by pleading with particularity that plaintiff possessed deceptive intent). Any proposed amended complaint should be attached as an exhibit to any motion for leave to amend.

## IV.     CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is **GRANTED.**

Count Five of the Complaint, any corresponding prayer for relief, and the prayer for relief demanding a constructive trust are dismissed from this lawsuit.

Any proposed amended complaint must be filed by **August 28, 2020**.

**SO ORDERED** at Bridgeport, Connecticut, this 24th day of July, 2020.

/s/ Victor A. Bolden
VICTOR A. BOLDEN
UNITED STATES DISTRICT JUDGE